† GEORGE M. WEISENBERGER v. GEORGE MILLER.

1. PROVISIONS OF LAW CONSIDERED.
   Under sec. 8 of the act of the legislature, of February 4, 1825, Swan's Statutes 1841, 747-748, the Canal Commissioners were authorized to take and appropriate any lands, waters, streams and material necessary for the prosecution of the improvement provided for in the act.

2. COMPENSATION TO OWNER OF PROPERTY THUS TAKEN.
   Under said section the owner of the property thus taken, upon application therefor, could have compensation awarded to him. Application for such compensation was required to be made within one year from the time the property was taken possession of by the Canal Commissioners.

3. CONDITIONS WHICH AMOUNT TO AN APPROPRIATION BY THE STATE.
   Where "slack-water" is caused to exist in one of the tributaries of a river, across which a dam was erected to provide for slack-water navigation in the river in which the dam was placed and as a feeder to the canal, and which slack-water does in no way interfere with the common and ordinary use of the premises and stream by the riparian owner. Held: An appropriation of the bed of the stream so as to vest the fee in the state does not exist.

4. STATE INVESTED WITH FEE IN BED OF STREAMS—HOW.
   In order to invest the state to the fee in the bed of the stream, there must be such serious interruption to the common and ordinary use of the property as will be equivalent to a taking.

Error. to the Court of Common Pleas of Defiance County.

MOORE, J.

This action was originally brought by plaintiff Weisenberger to recover the value of two thousand two hundred bushels of sand, which the plaintiff alleges the defendant took from the leased premises of the plaintiff. That he entered without authority the premises to-wit: "The Bouton sand-bar" in the Auglaize river—being a part of the Bouton farm—and having taken the sand, converted it to his own use. That the plaintiff, by virtue of a written lease or contract, had the possession of and right to all the sand in the said sand-bar. That he is damaged in the sum of $66.00, for which he asks judgment.

The defendant answered: First—That the court had no jurisdiction, for the reason that the cause being appealed from the justice of the peace, drew into controversy the title to real estate. Second—A denial of all the allegations of the petition. Third—That the sand-bar described in the plaintiff's petition belongs to the state of Ohio, the same being beneath the slack-water caused by the damming of the Maumee river for the use, and as part of the canal system of the state. That by virtue of a contract with the board of public works, the defendant has the exclusive privilege of removing all the sand and gravel from the Maumee and Auglaize rivers included within such slack water, for the period of three years from June 20, 1891. He asks that if the court has jurisdiction he may be quieted in his right to the exclusive use of the sand-bar described.

---

† This judgment was affirmed by the supreme court, the entry being "It appears that one ground of reversal was that the verdict was against the weight of evidence. Other questions not passed upon." 55 O. S. 660

Plaintiff in reply denies all the allegations of fact in the answer averred.

A trial to a jury resulted in a verdict for the defendant.

A motion for a new trial was interposed, which was overruled by the court, and judgment rendered for the defendant on the verdict.

It is now sought to reverse the judgment below. The errors assigned are: That the court erred in overruling the motion for a new trial, which assignment raises the question as to whether the verdict is supported by sufficient evidence.

Second—That the court erred in overruling the motion filed on behalf of the plaintiff for judgment on the special findings notwithstanding the general verdict.

Third—That the court erred in its charge to the jury.

Fourth—That the court erred in refusing to charge the jury as requested by the plaintiff.

Fifth and Sixth—The court erred in admitting and refusing to admit certain evidence offered.

While the amount involved in this case is not of any considerable importance, still it may determine the rights of the parties in what may be quite a large amount, and it also involves questions of difficulty and importance.

It will be observed from the pleadings that the rights of the parties are dependent upon the title to what is termed the "Bouton sand-bar." The record discloses that this sand-bar is located in the Auglaize river, about one mile above where it puts into the Maumee. That about three and one-half miles below the mouth of the Auglaize, the board of public works, in about 1842 or 1843, erected a dam in the Maumee, called Independence Dam, for the purpose of making slack-water navigation in the Maumee from Defiance to near the dam, and also as a feeder for the canal. This dam caused the water to be raised or set back not only in the Maumee for more than the distance required for slack-water navigation, but also in its tributaries, including the Auglaize river, and to some extent as far as the sand-bar in dispute, and above it, so as to increase the depth of water over the bar.

It further appears that the sand-bar lies between the center line of the Auglaize river and the west or northwest bank of the river, and to which bank and land adjacent thereto Mrs. Juliet H. Bouton had title. By written contract the plaintiff had the exclusive right from Mrs. Bouton to the said sand-bar during the time it is claimed and proved that the defendant took the sand, which is the subject of controversy in this suit.

So that it appears that, unless the state by its action has appropriated the river for canal purposes and thus acquired it in fee, the plaintiff's right is evident.

The sand-bar extends out from the shore towards the center of the river with an eddy, or rather what is termed by the witnesses a bayou, running around the lower end of it, and extending up some distance between the bar and the main shore. It was near the lower end of the bar that defendant procured the sand, taking it from beneath the water with scoops and loading it upon boats. This sand-bar has largely increased, as also the land connecting it with the shore, by accumulations since the dam was built.

In this connection it may be as well to refer to the charge of the court which was excepted to, and also the proposition asked to be charged by the plaintiff and refused.

The court charged the following proposition, which was excepted to:

"But, on the other hand, if this sand-bar, or place where this sand was taken from, was at some point out in the stream away from the land, and at a point in the stream where the 'slack-water' or back water, caused by the erection of the dam, if one was erected at some point in the river below, which caused the water to back and become slack-water at the point where the sand was taken, and the sand was taken from some point in the river bed

where it was covered by the slack-water, then as a matter of law Mrs. Bouton had no right to give anybody any privilege to go out there and take sand. It was not her property."

The plaintiff asked the court to charge the jury the following, which was refused:

"If you find from the evidence that Mrs. Bouton owned the land, the bank of the river, that she has owned it since 1858, that her title extends to the middle of the channel of the river, and that she was entitled to whatever sand was thereafter attached to the bank of the river within the lines of the middle channel of the river, and the bank of the river."

The court modified this proposition by charging as follows:

"I will say to this jury that this proposition correctly states the law of the case; unless at the point where the sand was taken it was in the bed of the river and covered with slack water, caused by the erection of the dam, if one was erected."

Other requests were made and refused, but the foregoing sufficiently presents the question arising in the case.

The facts of the case, coupled with the charge given and refused to charge as asked, puts the case in a nut-shell. And that is—if the sand bar, or place from which the sand was taken, was covered by the slack water caused by the Independence Dam, the state had the title, and the plaintiff could not recover. This was the position taken by the lower court, and if correct, the judgment should be affirmed, otherwise reversed.

It is claimed that the right of the state arises under the statute of Ohio, passed February 4, 1825. I read from Swan's Statutes of 1841, pages 747 and 748:

"Section VIII. That it shall and may be lawful for the said canal commissioners, and each of them, by themselves, and any and every superintendent, agent and engineer employed by them, to enter upon, and take possession of, and use, all and singular any lands, waters, streams, and materials, necessary for the prosecution of the improvement intended by this act; and to make all such canals, feeders, dykes, locks, dams, and other works and devices as they may think proper for making said improvements; doing, nevertheless, no unnecessary damage; and that in case any lands, waters, streams or materials, taken and appropriated for any of the purposes aforesaid, shall not be given or granted this state, it shall be the duty of the canal commissioners, on application being made to them by the owner or owners of any such lands, waters, streams, or materials, to appoint, by writing, not less than three, nor more than five, discreet disinterested persons as appraisers, who shall, before they enter upon the duties of their appointment, severally take an oath or affirmation, before some persons authorized to administer oaths, faithfully and impartially to perform the trust and duties required of them by this act, a certificate of which oath or affirmation shall be filed with the secretary of the canal commissioners; and it shall be the duty of said appraisers, or a majority of them, to make a just and equitable estimate and appraisal of the loss or damage, if any, over and above the benefit and advantage to the respective owners and proprietors, or parties interested in the premises, so required for the premises aforesaid; and the said appraisers, or a majority of them, shall make regular entries of their determination and appraisal, with an apt and sufficient description of the several premises appropriated for the purposes aforesaid, in a book, or books, to be provided and kept by the canal commissioners, and sign and certify their names to such entries and appraisal in like manner certify their determinations as to those several premises which will suffer no damage, or will be benefited by, or in consequence of the works aforesaid; and the canal commissioners shall pay the damages so to be assessed and appraised, and the fee-simple of the premises so appropriated shall be vested in this state; provided, however, that all such applications to the board of canal commissioners, for compensation for any lands, waters, streams or materials so appropriated, shall be made within one year after such lands, waters, streams or materials shall have been taken possession of by the said commissioners for the purposes aforesaid."

If the raising of the water in the bed of the stream so as to increase its depth and retard its flow, causing "slack-water" is an appropriation by the state of the bed of the stream, then the state has the fee to the sand-bar from which the sand in controversy was taken.

Upon this proposition the defendant has cited us to numerous authorities, amongst which that of Pumpelly v. Green Bay Co., 13 Wall., 166, is most relied upon. In the syllabus of the case the court hold:

"It is not necessary that property should be absolutely taken in the narrowest sense of the word, to bring the case within the protection of the constitutional provision. There

may be such serious interruption to the common and necessary use of the property as will be equivalent to the taking, within the meaning of the constitution. The backing of water so as to overflow the lands of an individual, or any other superinduced addition of water, earth, sand, or other material or artificial structure placed on land, if done under statutes authorizing it for the public benefit, is such taking as by the constitutional provisions demands compensation."

We find upon an examination of the case that it presents an entirely different state of facts from the one at bar. Suit was brought to recover for the injury resulting from overflowing 640 acres of plaintiff's land. That the waters of the lake were raised so high by the erection of the dam as to, with force and violence, overflow all the land continuously, causing his trees, crops, grass, etc., to be destroyed, and in effect to destroy the use of 640 acres of land. It was upon this state of facts that the court announced the law.

In determining the case at bar we must not overlook the facts as disclosed by the record. The structure or dam is four and a half miles distant, located upon another stream of water, of which the Auglaize is but tributary.

The mouth of the Auglaize was one mile below the sand bar. The water was raised in the bed of the stream perhaps two feet. The lands of Mrs. Bouton, were not overflowed. There was no serious interruption to the common and necessary use of the property. Mrs. Bouton, or those acting for her, continuously took sand by boat and otherwise, without interruption or inconvenience, until about the time this controversy arose. The state appeared to make no claim further than to draw off the water that was backed up in the stream.

There is no evidence that the state used, attempted, or intended to use the bed of the Auglaize river for navigation purposes. Nothing resulted from the construction of the dam further than I have stated, to-wit: to increase the depth of the water in the stream; to retard its flow. This is all the state did, and that, so that at stages of low water it would aid in floating boats on the Maumee and be drawn off into the canal where it leaves the river at the dam below.

The right of the state to the use of the water and to the control of its flow, to draw it into the canal for its uses, cannot be questioned. If it becomes necessary to appropriate the fee in the real estate, it has the unquestioned right to make such appropriation. If there was serious interruption to the common and necessary use of the property such as backing the water to overflow the land, or any other superinduced addition of water and earth, or other material or artificial structure placed upon the land, so as to constitute a taking, and the party failed to make his claim within the time limited by statute, it would be held to be an appropriation.

The right of the state to draw the water for canal purposes, as indicated, we think is sustained in Cooper v. Williams, 4 Ohio, 253; (s. c., 5 Ohio, 391). The case is entirely different from that where the state overflows lands in reservoirs, basins, etc., where what was dry land before is covered with water for canal purposes. In the case under consideration the necessity for making the appropriation did not exist.

The public had an easement in the river, it being one of the navigable streams of the state. The owner had the right to the use of the water as it passed through her farm. The state sought to appropriate the water so as to increase or retard its flow as the case might demand. There was no necessity to appropriate real estate, sand or gravel for such purpose. It is useless to cite authorities to show that before private property can be taken for public purposes the necessity for its use must exist.

And we think that before a party can be bound so as to have waived his demand for compensation, such acts must be had or exist as to materially interfere with the common and necessary use of the premises. The water was thrown or set back in the Auglaize river and drawn off as required without in the least interfering with or inconveniencing Mrs. Bouton in the use of the premises or in

the procuring sand from the bar. Her rights were in no way disturbed. Then how can it be said that such a taking of her property was had, so as to constitute an appropriation by the state divesting her of her title and investing the state with it?

The constitutional provision protecting private property is always understood to have been adopted for the protection and security of the individual as against the government. No action was taken, or finding the necessity of this appropriation is shown to have been had by any board or officer of the state. No result following which would notify the party, by interfering with her property or rights, exists.

Still, the state, quietly, insidiously, thief-like, comes, asserts its right and deprives one of its citizens of her property. A majority of the court does not adhere to any such doctrine.

That the state could acquire a right to the use of the water in the Maumee and Auglaize rivers cannot be controverted. That right could be exercised with or without the dam that was constructed in the Maumee river. That use could exist without interfering with the riparian owners along the shore or bank of the river; for while they owned the fee of the bed of the stream, they only have a right in the use of the water as it flows along. Blackstone observes, "Water is a movable, wandering thing, and must of necessity continue common by the law of nature. So that but a temporary, transient, usufructuary right of property, can exist therein."

Neither the subject nor the sovereign could acquire more than the right to the use of the water. Neither could acquire ownership to the mass of flowing water, though either could acquire the right to its use. The state exercises its right to have and control the use of the water in the Maumee river—to increase and diminish its flow as the demands of navigation might require. To do so, the necessity to appropriate the bed of the stream did not arise or exist. Suppose the canals were abandoned, or even that the dam in the Maumee river be taken away, could it be said that the state would have a fee in the Auglaize river from its mouth to the terminus of the slack water; could sell it and thus create an ownership in fee in the bed of the river, destroying the rights of the riparian proprietors on either side? We think not. Such a claim appears to be preposterous.

Where reservoirs are abandoned and the waters drawn off, dry land is exposed. In that the state has the fee, and can exercise the rights of ownership; what was covered with water is made land; not so with the river. It is still water, and continues to flow on forever, regardless of whether the canal survives or perishes.

Under the facts in this case it would be harsh indeed for the state to apply the rule asked for, to deprive one of its citizens of her property.

Where the state has acquiesced in the continuous use of the property by the riparian owner for a period of thirty years, and limited its use to that of the water alone is it not estopped to claim more than it has itself defined to be the extent of

This question is made that the justice of the peace had no jurisdiction, and its ownership? It is not necessary, however, to discuss this question.
hence no jurisdiction could be acquired by the common pleas upon the appeal.

It was an action for trespass to real estate and the justice had jurisdiction. Secs. 584 and 591, Rev. Stat.

A majority of the court is of the opinion that the court below erred in overruling the motion for a new trial, for the reasons assigned; that the verdict is not supported by sufficient evidence; that the court erred in its charge to the jury, which was excepted to at the time by plaintiff, and in its refusal to charge the first proposition asked, and in its modification of such proposition.

Judgment below reversed, and cause remanded.

Seney, J., concurs, Day, J., dissents.

John W. Slough and B. B. Kingsbury, for plaintiff.

Harris & Cameron, for defendant.